Appeal 5048 from this year, May v. United States, and Appeal 7101 from this year, Lancaster v. Department of Veterans Affairs. Before we begin the three arguments, the court wishes to express its great appreciation to Chief Judge Ron Walker, seated on my left, who is the Chief Judge of the District Court in the Northern District of California, and he joins us today and tomorrow, participating in our regular panels as part of our program of having at least one district judge with us each argument. So we thank Judge Walker for his generosity and help on these cases. We'll hear argument first in Appeal 1556 from 2007, Koyo Seiko v. United States. Mr. Chairman, good morning. Good morning. Please proceed. I want to observe the outset that in light of the recent decision, it looks to me like many of the arguments, many of the issues are foreclosed. And if there's some very persuasive reason why that isn't so, I think we'd like to hear that at the outset. And otherwise, I assume that all three counsel will focus on what's not yet foreclosed. Please proceed. Good morning. May it please the Court, Matthew Jaffe, Nicole Moring on behalf of SK. You're correct, and I expect that the appellees will suggest to the Court that SKF should pass judgment as to this particular case. I'm going to talk about model match retroactivity and show you that to the contrary, there are factors in this case that distinguish us from SKF. There's a unique record here, something that if you examine according to the three-part test articulated in the 2007 decision, Parkdale confirms that they should not apply their methodology retroactivity. Again, according to Parkdale, the trigger date is initiation. That's June 30, 2004. That's when this review was initiated. There was a case that was brought by SK, August 20, 2004, two months later, in which we said the matter was ripe for review. Commerce had made a final determination to jettison the longstanding family approach. And the Court rejected it, said no final determination was made. And the government and Timken argued vigorously against it. Let me quote from Timken's brief below in that case. That's correct, and we respect the retrospective nature. But model match, as the Congress has said, goes to the very heart of this case. If you look at Joint Appendix 411, it's extremely important. Price comparison is the heart of the anti-dumping law. What's unique here is that when we brought this NSK case below to challenge this, we tried to argue that a final determination was made. Let's look at this case. And what they argued in response was that we could not rely on anything here. That no final determination was made as of the trigger date. That specifically NSK does not, this is Timken talking, you cannot know precisely what methodology Congress will use or what impact it will have on NSK's margin. So here it is in September 2004, after the initiation date, after the trigger date, in which the Court then reaches a determination that we do not have settled expectations as to exactly what's going to happen. Nothing has happened as of the trigger date. So when you look at the degree of connection between the operation of the new rule and the relevant past event, that's the second factor in Parkdale. Parkdale, you had initiation on August 1, 2003. The decision was before, March 6, 2003. Here, the liquidation date, June 30, 2004, the final decision memo after NSK said there's no final decision, doesn't happen until 2005. Degree of connection here is very strong, Parkdale No. 2. Parkdale No. 1, nature and extent of the change of law, joint appendix, 411. Congress Department, December 2003, specifically says model match is extremely important. This is not like our other argument here, like the Japanese worker expenses. But isn't this argument that you're making, that it should not be applied retroactively, that was explicitly considered and rejected in SKL. I noticed on page 12 it says that they argue that we should not permit Congress to apply the modified model match methodology retroactively. And then it says that argument abhors the inherently retrospective nature of the anti-dumping duty statutory scheme. So it does seem fairly to me that SKF has said we're not going to consider or reject the argument that it's impermissibly retroactive because of the nature of the inquiry that's being asked. Yes, but it did not apply in SKF to Parkdale test. It applied to Shikoku test, which to me is the shorthand for the third element of Parkdale, consideration of fair notice, reasonable lines, settled expectation. Again, we have this court case that's unique here. It's not in SKF, in which it clearly says we do not have settled expectation. Also here, what is interesting in Parkdale, the rule went into effect in 1998, substantially as proposed. It went into effect again later substantially as proposed, but if you look at the joint appendix again, page 413, you're going to see where the Commerce Department says that the Timken methodology that eventually became a final determination. What are the bases for the settled expectations that you plan? Are settled expectations? Yes, there are none. If you look at the joint appendix again, here it says 413, page 413. This is December 2003 memo. It says there, remember, it's the Timken proposal that eventually becomes the final determination. But before the date of initiation, it says, the Commerce says, we're not convinced that the Timken proposal, selecting a most similar model using a sum of deviation methodology, would be substantially better than the family averaging methodology. So they found fault with it. So our expectation is not the Timken. We're basically, to a certain extent, in limbo, which is why we brought that case, to find out what our expectation should be. And the Commerce Department and Timken said, there's no final determination, no settled expectation. You can't reasonably rely on anything we've done to date, and there's no doubt. All right, Mr. Ellis. Good morning, Your Honors. We also obviously recognize the fact that the SKF case has foreclosed much of the argument here. It's unfortunate in a way, because SKF arose out of the exact same case below. We were consolidated at that time, but they got ahead of us here. But leaving aside, I'm not going to try to accept your invitation to try to deal with some fundamental problems with SKF, but rather I'd like to point out a couple of ways in which our position is different from that of SKF's. For the record, by the way, I represent Collier-Saco and Collier Corporation of the USA. One key point that the Court noted in SKF, and this was the opinion on page 9, was that there the appellate SKF itself failed to provide any evidence of inappropriate individual matches that were generated by this new model match system that the Department had adopted. And we were quite the opposite. We submitted large amounts of evidence throughout the course of the proceeding, affidavits, individual models, prescriptions, etc., showing how the match was generating inappropriate, I'm sorry, the model match was generating inappropriate matches in the U.S. to home market models. And for the record, there is a large series of such matches. There's eight specific matches we provided a lot of evidence for in the joint appendix of pages 861 to 883. Then we attached a, this was submitted to the Department, and then we submitted also a list of additional inappropriate matches just in the computer database, a computer listing, as to which we requested the Department to permit an opportunity to provide more information as to why those matches also were inappropriate. Because on the surface, that is looking at the physical characteristic dimensions in the computer listing, they looked inappropriate. The problem is, one of the points that we had made for the Department was that there was no system that was set up, no procedure by which individual mismatches like ours could be addressed. Going back in... Is your point that there were so many mismatches, such a large proportion of the matches were, in your view, mismatches, that that discredits the entire methodology and makes it unusable? Is that your point? We had two points based on these mismatches. First was the point you just stated. That is, we are severely troubled by a model match that generates large numbers of individual matches. Well, what's the denominator? If there were eight mismatches, in your view, eight, out of how many? There were thousands. So eight out of, let's say, 2,000 seems almost de minimis, almost negligible. Not a reason to say a model is no good because there are a few outlier applications, if the vast majority of the applications seem quite sad. You're right, that's a good point. You remember that when we had challenged the model match as a whole, we had other legal points that have now been foreclosed by the SKF decision. So it wasn't merely the fact that we had eight or eight plus 14. I've already covered it in this match. So the second point that we were making on the basis of these inappropriate matches is that, at a minimum, there has to be a process by which these individual matches are individually studied by the department. In other words, we've submitted evidence on a record. There has to be a or a what? The entire methodology has to be declared illegal if there isn't some special procedure set up to deal with alleged mismatches? No, no, not at all. It's that you can live with the general methodology, but there has to be a safety valve additional system to permit a response. Or a what? There has to be a safety valve or a what? Or what will happen? In that case, I would say the model match is inappropriate. If you have a system that does not permit individualized addressing of situations that don't meet the statutory requirements for such or similar merchandise, then yes, then you have a flaw. Any time you have a general system, there are inevitably going to be situations that the peripheral unit doesn't fully cover. And I'm thinking what you're asking for is if we have 2,000, every one of them has to match. And if there are 6 or 8 that don't match, we should have the ability to show that something special has to be done for those 6 or 8. Sure. That to me seems to be perfectly appropriate. You have a very complicated product here, right, with thousands of models, thousands of measures, hundreds of thousands of sales in the home market. Even if you have a system under the old family system or the new model match system, there are going to be strange situations arise. It's inevitable. You're going to get coincidences and costs of models that are otherwise grossly similar. Even if you're correct, what is the authority for saying there has to be individually adjudications of the questioned matches or the whole methodology has to be declared unusable? What was the authority for saying that? Well, I have no authority for saying that. But I have authority for saying, I mean, the statute requires that matches that such or similar merchandise be applied in the uses and approximately equal for commercial purposes. That isn't – you can't say just because in general, you know, the 2,000 matches up to 1,900 are okay, therefore we don't have to look at anything else. Why not? Why can't you say precisely that? Look, the world isn't perfect. No system will get 1,000 percent perfection. If it's right most of the time, that's good enough. That's a matter of practicality. Too cumbersome, too expensive, too slow. But there's no evidence of this. That would be fine, but the agency didn't say any of that. They didn't say too cumbersome, too slow, too complex. They just said we don't have to deal with this. I don't think you can attack their rulemaking here in this case. I don't know why not. We submitted exact specific evidence that shows specific matches. We're not talking in theory now that there might be situations that are bad if this new match generates. There's evidence on the record, unrefuted evidence on the record that shows that these matches are inappropriate. The Department didn't address this. What are you asking us to hold? Are you asking us to hold that the entire system, the entire model is no good, or are you asking us to say there should be exceptions created for these unusual situations? The latter. I'm asking that a remand be ordered to permit the Department to consider the evidence on the record that they've announced. And how many of these inappropriate matches requires a remand? Right. Where do you draw the line? If a respondent has submitted evidence on the record showing that matches are inappropriate, they should be dealt with in the first instance by the agency. One. Sure. There was a case 10 years ago in this case involving the family, the old system, where we had one match that was wrong. And it was a family that was working fine. We had one match that was wrong. We asked the court to remand to have the agency consider that one inappropriate match. And the court, not this court, the court below, held fine. They did that and remanded it. If there's evidence on the record that it's one match or a thousand, if there's evidence on the record showing that it's inappropriate, they should be considered. Otherwise, you're ignoring substantial evidence on the record. Did you make a similar request in this case to further the match inquiry? Did you make a similar request to remand just to consider those matches? Yes. In the alternative, we argue that these inappropriate matches should have been addressed by the agency. All right. Thank you, Your Honors. Ms. McDonough? Good morning to you. Good morning. Preliminarily, am I correct that you are going to deliver a rebuttal argument for about a minute at the end of our proceedings here? Is that right? That is the plan. That's fine. Thank you. I just wanted to clarify. Go ahead. Great. And I want to also make clear that I am representing both the NTN Companies and NPB and FYH. I would also say that one mismatch is possible to cause a very large margin. Your margins are, weighted average margin is 10%. One or two mismatches, one bearing, one sale can cause 80%, 90% of that margin. It all depends. Do you have different mismatches than Mr. Ellis? Yes. We have evidence on the record. How consequential are your alleged mismatches in dollar terms? I believe it's impossible to quantify because our mismatches relate to our bearing design argument. NTN has presented evidence that was accepted by Congress in the previous 14 repeats of this case. NTN presented evidence that 100 or so bearing design types produce more accurate matches. So the whole procedure would have to be rerun in order to determine the difference in the quantifiable difference. But you're not complaining about specific mismatches. You're complaining that your 100 categories had to be used, not Congress's 7. Yes. You're saying the entire result has to be thrown out because they didn't use your 100, they used their 7. Well, we believe that the use of NTN's bearing design types produces more accurate matches. Even if it does, how does that entitle you to have the Congress determination overturned? Well, Congress stated that its new methodology produced more accurate matches than the family methodology. Maybe in general it does, but not in every specific application. Well, Congress's new methodology uses fewer matching criteria. So by logic, it produces more matches. But that's not to say that any of these matches are more accurate matches. And Congress did not provide any evidence that these were more accurate matches for either NTN or MPP. And Congress failed to explain why the evidence on the record submitted by both of these companies did not provide more accurate matches. For example, NTN submitted evidence that bearing design is one of the 8 characteristics that was used in the family methodology. And it continued to be used by Congress. Is it your argument that because the nature of the new methodology inevitably is going to lead to mismatches, the new methodology is impermissible? Our argument is that Congress stated the reason for changing to the new methodology was that it produced more accurate matches and we do not believe that is so. So you're not making the argument I just suggested? No, a slightly different version of it. The second part of our argument is that Congress did not produce any evidence on the record that their matches were more accurate, simply stating that they're more accurate doesn't make it so. NTN provided evidence that... I thought one of the justifications was that there would be fewer instances in which constructive price would have to be used and that there was a policy preference for actual price. Why doesn't that justification suffice? Because, again, if fewer criteria are used to make matches, you will get more price-to-price matches. But Congress did not provide any evidence to show that these were more accurate matches. Yes, there are more price-to-price matches, but there's no evidence that they're more accurate. And second, constructive values... Is there evidence that they're plainly less accurate? Congress did not provide evidence... But did you provide evidence that this new system was less accurate? Yes, we did. Both NTN and NPP did. NTN provided 80 or so pages of evidence and Congress simply labeled it, summarily rejected it as unusable. In the bar making stage or in this litigation? Throughout the procedure. In the rule making stage, in the final results, that's where the label was first used, the Court of International Trade agreed, and that's why we are here today. I'm very enthused about what you are really arguing here. It almost sounds like you're saying the importer should be able to dictate the methodology Congress has to use, and that seems to stay in administrative law on its head. No. The agency gets to choose the methodology as long as it isn't nuts. If it's illogical or disproportionate or irrational or something like that, of course it's not in accordance with the statute. But assuming that it's reasonably accurate, let's assume there are five reasonably accurate methods. And maybe people would disagree about what the ranking would be, which is the most accurate. But there are five reasonably accurate methods. I would assume Congress could choose any of those five and be on very solid ground. Do you disagree with that? Yes, for NTN's bearing design argument, because NTN provided the same and used the same bearing design for the prior 14 reviews of this case. Congress never once stated that these produced inaccurate matches. So what does that have to do with whether Congress can change to a methodology that it determines is more accurate overall? Well, we contend that Congress did not actually review the evidence on the record. They simply labeled it unusable without further explanation. So when they departed from 14 prior years in this case, they did not provide a reasoned explanation. Congress didn't review the evidence. What you're saying is Congress didn't explicitly discuss the evidence. How do you know Congress didn't review it and say, well, we don't have to discuss the evidence. All we have to do is give our conclusions. I can't know what Congress did internally, but their stated explanation of its rejection of more than 80 pages of evidence, charts, cross-keys to the evidence, examples, explanations, was simply a one-word that was unusable. And that NTN did not provide any evidence showing that the matches were more accurate. So I can only go by their public statements, which would be the record. So are you saying then that the articulated justification was so inadequate in view of the evidence that it has to be rejected and therefore the method it was attempting to justify also has to be rejected, and this case has to start all over again with an administrative review under the prior test, prior methodology? Well, I'm stating that given the evidence on the record, detailed evidence on the record, by both NTN and NPBF mismatches, given the detailed evidence, the explanatory evidence, given Congress' statement that NTN was unusable and given that they only responded very briefly to NTN's mismatches, given that Congress used the varying designs of NTN in the previous 14 reviews and the family methodology of the previous 14 reviews for both of these clients, yes, I mean, Congress, this should be remembered. I'm being lost. I can't tell whether you're depending on a no retroactivity argument based on unfairness or whether you're saying that Congress chose an impermissible method or whether you're saying they chose a permissible method but they didn't justify it in the face of our contrary evidence. I can't tell where you are here. I'm saying that Congress did not provide a reasoned analysis for rejecting the evidence on the record that was used in the prior 14 reviews of that case and this is what the standard of review is for Congress' decision. There was no reasoned analysis. You say it's not enough for Congress to say we think and we believe that the new method will be more accurate. That's not enough to justify change in the method. Well, Congress justified its increased accuracy on the grounds that there were more price-to-price matches but it never suggested that these price-to-price matches were more accurate. It stated that they were but it never provided evidence that they were. I mean, we believe that our clients have rebutted. What is your strongest authority for the proposition that they have to rebut your evidence point-by-point or their method is unacceptable? What case holds them? Well, I'm not saying that they have to rebut our evidence point-by-point but some indication that the agency reviewed the detailed evidence on the record, it's inconceivable to us that it was labeled unusable, for one thing, because there were many, many explanations in the charts following the way that this worked. So, given that... If they added a sentence to their long discussion of changing the method saying, we will consider the evidence submitted by the companies which find it unconvincing, would that have cured all of the defects? I don't believe that it would cure the defects because... They have to discuss it in more detail. Well, the reason... They have to discuss the evidence in greater detail because you said a mis-concluding statement that they had considered all the evidence but found that unpersuasive wouldn't be enough. Well, unpersuasive wasn't the term used. I think it was unusable. Well, what less than a point-by-point rebuttal do you think would satisfy what you say the legal requirement is? A reasoned analysis of why these... It would more than qualify as a reasoned analysis that's short of discussing why each alleged mismatch really isn't a mismatch. I don't think that there have to be each alleged mismatch. But, for example, there are... Commerce provided a design code for angular contact bearing or a thrust ball bearing. NTM produces a bearing that is an angular contact thrust ball bearing. So, it clearly crosses and encompasses both of these design types. NTM created its own design type in order to solve this dilemma. Commerce did not even respond to this in any way. There was no explanation of why... NTM's explanation that its own design type is more... more accurately describes this bearing than either of Commerce's which describes half of them. Do you think it would satisfy your theory if Commerce said something like that all of these alleged mismatches fall into three categories and let it discuss each category as a category but didn't deal with the individual mismatches within the category? Would that be enough? If the explanation demonstrated a reasoned analysis for rejecting the mismatches... I actually keep saying a reasoned analysis. I don't quite know what that means. There may be a lot of lawyers who think that our opinions don't provide a reasoned analysis. They jump into conclusions. That doesn't mean that the way we analyzed it is improper. Well, I think that clearly something more than stating that NTM's evidence was unusable is called for. And secondly, NPD provided a lot of different examples of mismatches. It demonstrated that what it believed were the correct matches and the programming language to achieve this. So, again, there was absolutely no response to any of this. Perhaps an example or analysis that said these mismatches are not proper or are proper under our new methodology because X. That would have been proper. Let's hear from the Governor. Thank you. Good morning. May it please the Court. First, with respect to the retroactivity issues raised by NTM, obviously it's the government's position that this Court's decision in SKF from last week resolves both that issue and all of the issues regarding Congress's revised model match methodology. Mr. Jaffe suggested... Mr. Jaffe depends on the Park Lane case for support that there are limits to Congress's right to retroactively apply new methods. So it seems like your response should be, well, his reading of Park Lane is wrong because... I think one of the things that Mr. Jaffe said is that, well, he's correct that the Court in SKF didn't cite Parkdale. However, the party certainly argued Parkdale. Parkdale wasn't a countervailing duties case, was it? It was an anti-dumping case. So it's a similar case in that respect. It's a general proposition of when something is impermissibly retroactive. I'm sorry, yes. It addressed that question. And we cited Parkdale in our brief. Parkdale supports our position. Parkdale goes through the retroactivity test from Princess Cruz and essentially supports the position that in this kind of a case, when you're talking about the inherent retrospective nature of Congress's decisions, there can never be any reasonable reliance when Congress has the power to change a methodology and apply that change retrospectively. I thought Mr. Jaffe argued that under Parkdale, there were three tests, and he says that he's met all three of the tests. Therefore, he gets the benefit of Parkdale. Therefore, retroactivity is not solved. That seemed to be the line of argument. So it seems to me you have to say either he's misreading Parkdale or he doesn't meet one of the Parkdale tests and here's the test he doesn't meet and here's why he doesn't meet it. Otherwise, we're not getting anywhere. Or maybe you can say that the Parkdale rules regarding retroactivity do not apply in this situation because of the nature of the inquiry that Congress is making here. Congress is not speaking for the future, but Congress is reexamining what happened in the past and deciding how to characterize it. I think what I'm going to say is a little bit of both. First, with respect to the test articulated in Parkdale, this court held in Parkdale that the operative event, past event in Parkdale, unlike what Mr. Jaffe said, the operative event is liquidation. Liquidation in this case has obviously not occurred yet. Let me ask you a different question. Suppose in the 14th annual review, Congress had said, we have been told that maybe we should change our methodology. We're not going to do it now and we're not going to do it in the 15th review. We assure you that in the 15th review we will continue to follow the existing methodology, but maybe we're going to change it in the 16th review. Suppose that's absurd, but let's suppose for the sake of argument they said that. Wouldn't that preclude them from coming along later on in the 15th review and changing their methodology if the other side could show they rely on these statements in calculating their pricing? Well, it's possible that if Commerce promised the parties something along the lines of what Your Honor is suggesting and then gave the parties no notice pursuant to the statutory requirements. Well, I don't want to pose the situation where they gave affirmative notice they weren't going to change it and then subsequently in contrary to that notice they did change it. Well, I would argue that in that case Commerce would potentially be in violation of the statutory requirement to allow parties to comment on a proposed change. So I don't think we're necessarily- That, of course, isn't the case. Absolutely not. Absolutely not. Anything more about Parkdale or are we done with Parkdale? Just one more thing. It goes to the question of reliance. I think what Parkdale stands for on that question is that given the retrospective nature of Commerce's changes in methodology there can really never be any reasonable- a party could never satisfy that third test. Now, I understand that Parkdale doesn't actually say that, but it suggests that when you get to that third factor given this very peculiar statutory scheme in which decisions are made and applied going backwards the reliance question is very, very difficult to meet. And in this situation the parties were given so much more notice than they were statutorily entitled to. They were given almost two years of notice and opportunity to comment upon the way that- But once the methodology is adopted and about to be applied to them how much advanced time did they have from that date forward? Well, they had- I'm not sure what advanced time means. They had already priced all their goods at the point that the methodology was actually adopted. So too late for them to change their pricing. Well, that's correct. But the rules have changed when it's too late for them to change their conduct because conduct is all completed. So why doesn't that work in unfairness? Well, because the parties don't actually have a right to be able to change their pricing only prospectively. And this Court has already- this Court and the Court of International Trade have said that repeatedly. Given the retrospective nature of the system, I think in the appellant's view any change in methodology can only be applied to- so far in the future they would only affect new entries. And that is simply not the way the system works. I don't understand what you mean when you say that it's simply not the way the system works. We're not involved in an inquiry of how it works. We're involved in whether if it works a certain way it's unlawful. Unlawful is unfair, or unlawful is contrary to the statute, or unlawful under the requirement of notice in common. So it would help to say that's not the way the system works. I don't even know what that means. Well, the retrospective system has never been challenged as unlawful. It can't be unlawful per se because you can't do it prospectively. We all know that. Well, that's not necessarily true. I mean, this country doesn't do it prospectively, but other countries do it prospectively. I'm not sure what you're arguing. Are you saying that this kind of reliance that they say is determining what our pricing is going to be, we want to know how they're going to make some calculations in the future, and therefore they can't change it without giving us an opportunity to change our pricing, that that kind of reliance is not the sort of retroactivity that Parkland or the other cases are addressing? Is this basically what you're saying? This is not the situation where they suddenly announce that if I can set you such a date, you're going to have to do something else. Well, that's absolutely correct. This is not that situation. Moving on to Coyote's allegation of inappropriate matches. Yes, several parties, including Coyote and FPB, raised the question of dissimilar matches to commerce. But Mr. Ellis suggested that there is absolutely no system for parties to raise individual isolated incidents of alleged dissimilar matches, and that's absolutely not true. The parties stated during the administrative process leading up to this change in methodology, commerce has been quite clear that parties should feel encouraged to continue to do so. Well, what is the system? What's different if there's an alleged mismatch from when there isn't an alleged mismatch? Well, with respect, is your question what does commerce do differently? What does anybody do differently? Commerce or the import? Well, it's possible that if commerce is persuaded that the alleged match is so dissimilar that it should not be included in the methodology, then commerce could very well determine to exclude it. So the system is simply that they're allowed to cite mismatches and argue that they are mismatches that should be disallowed. That's correct. And so then what is your response to the argument that the process wasn't meaningful? Yes, we were allowed to cite mismatches, and we cited all this material and all these exhibits and so on, and it was all essentially ignored, dismissed out of hand. Well, I mean, is that a meaningful system? Well, it wasn't ignored. How do we know? Because commerce carefully considered both NPB's alleged dissimilar matches and COYO's alleged dissimilar matches. How do we know?  In the commerce section? And also on page 542 of the Joint Appendix, which is the final… Well, what did it say in either of those circumstances? What was the essence of what it said? Well, the essence is that, yes, COYO identified eight dissimilar matches, but the reason why COYO complains that these are dissimilar matches is because the two models being compared are, according to COYO, not commercially interchangeable, or they're not for the same commercial use. And as commerce pointed out, that is a question that would have never been considered even under the family methodology, and it isn't per se evidence of the dissimilar match. Were all eight? That was the response as to all eight? Well, no, commerce didn't go allegation by allegation. It just made a general response. But there are also going to be some mismatches, aren't there? Yes. In a system where you've got, well, thousands of different types of world variants. I mean, you're not going to have them all lined up one for one. There are going to be some with greater mismatches, some with slight mismatches. Some of them are going to meet one-on-one, I assume. That's sort of inevitable in what we're dealing with. Well, that's absolutely correct. We're not dealing with pianos where there may only be three different models involved. We're dealing with all sorts of world variants, made of different material, of different sizes, designed for different purposes. Yes, and I would argue that actually all matches are, in a way, dissimilar matches. We are not in the part of the statute in which commerce is making an identical match. We're in the part of the statute when commerce can't make an identical match. Wouldn't it be fair to say that they have to demonstrate something extreme, not just that there's a mismatch with this particular number, 610 Walbury, but that the mismatches were so extreme that it skewed the whole system? Isn't that what they have to show in the review? Well, that would have absolutely been more persuasive if Cuello had been able to demonstrate that it wasn't just these eight alleged mismatches, but there were so many mismatches that the entire integrity of the revised system was in jeopardy. And Cuello did not do that. So, I guess your response is that it wasn't adequate to use in analysis to point out that the purpose of the bearings was not an appropriate factor under either the old or new methodology? That's correct, particularly not when all of the alleged dissimilar matches satisfy the test that commerce has devised under the revised methodology, meaning it satisfied the identicality for the first four factors and then satisfied some of the deviations and the difference in pertinence. You keep talking about all of these technical distinctions and variations and so on, but the basic question is commerce is trying to determine whether they sold these products made in Japan in the United States for less than their fair market value. That's the inquiry, and therefore you've got to determine what is the fair market value of these products. That's nothing that you can just punch a whole bunch of stuff into a computer and the computer will tell you the answer within a one thousandth of a dollar or something. Yes, it's a very complicated process and it's obviously inherently imprecise and commerce does the best it can to make the most similar matches that it can find. How do we know that? Well, I think that this... Commerce is doing the best that is reasonable to do under the circumstances, the best that as a practical matter can be done. How can we assess that? You say it, but how can we assess whether that's an accurate statement? Well, first of all, I don't think the court has to agree with me that commerce is doing absolutely the best that it can. The court has to agree that commerce's decision is reasonable. In our opinion, the level of... before it changed this methodology, the level of opportunity that it gave all of the parties to comment on this change and the diligence with which commerce... The whole first part of the joint appendix, volume one, is a testament to the diligence with which commerce evaluated all of the parties' comments and tried very hard to come up with a methodology that would please everybody. The problem, it seems to me, with that approach is it doesn't really matter what opportunity you give them to comment if in fact commerce pays no attention to the comments. You've got to have two things. You've got to have the opportunity to comment and then you have to say that commerce considered these comments before it made its final decision. I mean, surely you've got to give an accurate notice of an opportunity to comment, but that isn't the end of the inquiry, that's just the beginning. Well, of course not, Your Honor. And again, the whole first part of the joint appendix is filled with commerce's direct response to the parties' comments, consideration, and in many instances, acceptance of parties' suggestions. For example, the way that commerce devised the cap on some of the deviations methodology was by using the parties' suggestions. And in this respect, NTN's specific suggestion of 40%. What about the challenge based on how many categories or types of variance are used in the analysis? As I recall, commerce had a typology involving five different types and they were later persuaded to add two more, so it went to seven. But at least one of the groups of companies said it should have been 100. How are we supposed to figure out what's a reasonable number of categories between one and 100? Is seven good enough or does it need to be 15 or 21 or 36 or all 100? Well, NTN is, I don't think, is arguing that there should be 100 categories for everybody. NTN is just arguing that there should be, whatever the number is, but let's say 100 categories for four days. I thought that's what Ms. Donovan said. I'm just using her number. Right. I think that what NTN is arguing is that there should be 100 categories for NTN, not that the entire methodology should be changed so that there are 100 categories for all respondents instead of seven. But for her clients, seven is all that was used. Well, for everybody, seven is all that was used. But we're just taking her clients. Seven were used and she said the only rational number would be 100 because they're all so different from one another. Right. And NTN, that is what she says. And NTN also suggests that... But what was Congress, where is Congress' analysis of what a reasonable number is between one and 100? Well, on page both 571 under the Joint Appendix and then also on page 1666, Congress explains why what NTN has suggested is insufficient. And the reason is because what all NTN said is we need extra categories because look at all of the difference. Look at all of this paperwork that demonstrates that these bearing designs are different. Well, what Congress responded was that that's not enough. You have to explain to us not just that they are different, but why the differences are not reasonably accounted for in the now seven categories. So by saying that they aren't useful, Congress was indicating that without analysis and explanation, the descriptive material about the 100 different types of bearings was not persuasive, not sufficient. Correct. Any other responses to arguments made by any of the three economists? No, Your Honor. Okay. Thank you. Mr. McDonald, you have a minute or two for rebuttal. For the bigger part, we have another athlete. We only have five lawyers in the case. I was losing count. Good morning. Welcome. Good morning. Good morning, Your Honor. We frequently see you in these complicated trade matters. Please proceed. Thank you. I represent the Timken Company, and I would like to come back on the discussion on the Congress's treatment of the evidence of mismatches that was provided by two respondents, not three. And I think the discussion has missed something. And what it has missed is that Commerce did, in fact, very carefully look at individual claims and, in fact, made the necessary change. So we can find this analysis. Otherwise, we're just talking broad generalizations. In the Joint Appendix on page 1286-87, it discusses the changes that it has made to the methodology applied for MPB. And you will see there that they decide that Commerce will adopt MPB's suggestion to have additional distinctions for insert bearings and house bearings, because they had, in fact, Those were the two they added. That's the two they added. That's right. Because they had agreed with MPB that the lack of these additional distinctions was causing problems in the model-match methodology. And then the rest of the page or two pages goes in rather lengthy detail about the other MPB allegations of mismatches. Now, I tell you, the reason why MPB is treated in such detail is because MPB was the only party that, when it submitted the evidence of mismatches, also had suggestions as to what would be the more appropriate matches. So it's altogether not surprising that Commerce, when it discusses this evidence of mismatches, goes into a whole lot more detail in the case of MPB than it does in the case of COIL or that it does in the case of MPB. Any other citations to Commerce's more particularized responses? Well, with regard to MPB, that is where that response is found. With regard to NTN, I direct the Board's attention to the joint appendix at page 1794A and to the IDM, which is at the joint appendix 570 and 72. And the discussion that you see there applies to NTN. This is the issue of NTN's whatever the number is where it's more than 100 new design types that they propose. And what you will see, you might also look at the joint appendix 1690, which is the original response of NTN. And the storyline is basically this. In its response, NTN basically presented Commerce with this huge number of additional design types. They're departing from what the questionnaire asked for. Then Commerce immediately, in its supplemental questionnaire, asked NTN, well, wait a minute, how about all these different design types? Would you please explain to us why we should use all these different design types? And NTN's answer in the supplemental questionnaire was a stack or a series of descriptive drawings and so forth, things that described what the differences were between the different design types. And Commerce's understandable answer to that is, well, okay, now you're showing to us that all these different design types that you distinguish in your catalogs have some grounding. They indicate some differences. But you're not telling us why it is that we should adopt this. We have adopted this other methodology based on our seven design types for all the other respondents. Why should we adopt yours? Yours is essentially an end run around our methodology because you must remember design type is one of the exclusionary characteristics. If a pairing doesn't match as to the design type, it doesn't get reported and it doesn't get compared. So Commerce doesn't even have a chance to check. It doesn't appear in the database. So obviously Commerce is going to be very reluctant to just accept what is essentially an undoing of Commerce's methodology by this backdoor of having this huge number of additional design types. And that's all I had to say about it. Thank you very much. Mr. O'Donnell, our funding visit is adjourned. As a result of Commerce's new methodology, NPV's dumping margin increased from 3.38% in the 14th review to 15.51% in the 15th review. Now nothing has changed about the bearings in the case or any other aspect of NPV's business other than normal changes in business. So this is a significant difference and Commerce has never explained why these increased margins are more accurate than the previous 14 years. Same with NTN's bearing design types. Commerce accepted that for 14 years as appropriate under the statute and as resulting in correct matches. Commerce never once said that they were incorrect. Again, there's no explanation in all of the evidence that NTN provided to support the designs that they have used for the previous 14 years as to why these were incorrect. But the implication that your suggestion seems to be it worked well enough before, they were satisfied with it before, we were satisfied with it before, and therefore they're not allowed to change it. The conclusion doesn't necessarily follow from the premise. Well, I think that we have all heard from the courts that agencies are allowed to change their practices. But given that this was in use for 14 years, given that Commerce never said anything changed in the bearing industry, it's a very mature industry, given that Commerce said its new methodology was more accurate, we do not believe that Commerce provided the evidence for this change in long-standing practice. It's not adequate evidence. It's not adequate explanation in your view. All right, I think we have the positions of all the parties. We thank all five counsels for a thoughtful argument and take the appeal under advice.